## LEVY & ALS. *vs.* MERRILL & AL.

Where the underwriter, in a policy of insurance, professes to take " the risks contained in all regular policies," a loss by capture is within the policy. And parol evidence is not admissible to prove that the parties understood it as covering sea risks only.

If the goods of a Spaniard, insured by an American, are shipped in the name of the insurer, by agreement of the parties, to protect them against the enemies of Spain, the policy is not therefore void; nor does the transaction contravene any provision of the treaty of 1795, between the United States and Spain.

Where goods insured are shipped on board a vessel of the underwriter, on freight, a loss happening by the want of proper documents, or by the carrying of contraband articles, is chargeable upon the underwriter alone, and does not affect the right of the assured to recover upon the policy.

It is not necessary, by the statute of frauds, that the consideration for a collateral undertaking should be recited in the note or memorandum signed by the party to be charged.

THIS was an action of *assumpsit* on a collateral undertaking of the defendants to guaranty the performance of a contract entered into by *Joshua Gordon*, relative to the insurance of a quantity of mahogany on board the brig *Sam*, on a voyage from *St. Domingo* to the island of *St. Thomas*. It was tried before the Chief Justice, upon the general issue. The original undertaking was as follows.—

" I the undersigned do hereby insure to Messrs. *Levy fils aine*
" & *Co.* to the amount of two thousand dollars, on mahogany now
" on board the American brig *Sam*, Capt. *Prentiss Crowell*, at
" present at anchor in the port of *St. Domingo*, from whence she
" will proceed, as soon as circumstances will admit, to the port of
" *St. Thomas*, where the risk will end twenty-four hours after
" the vessel is safely moored, and acknowledge to have receiv-
" ed in hand the premium on said insurance, at and after the
" rate of one per cent.—Touching the risks I am willing to bear,
" they are the same as contained in all regular policies of insur-
" ance; and should there any difficulty arise in the adjusting this
" policy, I am willing the same shall be decided according to the
" rules established at *Lloyd's* in *London*, or at the regular insur-

" ance offices in the United States.   I further declare that al-
" though the bills of lading and invoice are made out in my name,
" it is merely to secure the property, which in reality belongs to
" Messrs. *Levy fils aine & Co.     St. Domingo, March* 15, 1822."
Signed, " *Joshua Gordon.*"

By the bill of lading, and invoice, produced by the plaintiffs,
the property appeared to belong to *Joshua Gordon.*   On the 17th
of *April,* soon after the brig sailed, she was captured by a Spanish
privateer, and carried into *Porto Rico* for adjudication, where the
vessel was decreed to be given up, but the cargo condemned.
In the report of the capture, by the captain of the port, and in the
libel of the captors, it was alleged that the clearance and mani-
fest were irregular,—that the captain had admitted that he had
previously navigated the same vessel under the patriot-flag,—
that various munitions of war were found on board, together with
sundry articles not mentioned in the manifest,—and that the ves-
sel had contravened the fourteenth and seventeenth articles of
the treaty of *Oct.* 27, 1796, between the United States and Spain.
In the decree of condemnation, the judge declared the proof of
property of the cargo to be insufficient, and " having before him
" the thirty-second article of the last ordinance for cruising, and
" the seventeenth article of the treaty of amity, limits and navi-
" gation between Spain and the United States of America," he
confirmed his first sentence of the eighth of *May* preceding, and
condemned the cargo to the captors.   This final condemnation
was on the eighteenth of *July* 1822.

It was proved by the plaintiffs, that in fifteen days after the
vessel sailed, a rumor prevailed in *St. Domingo* that she was
captured and carried into *Porto Rico,* which is about ten or twelve
days sail from the former place ;—that sometime in *July* or about
the first of *August,* the defendant *Merrill,* being at *St. Domingo,*
informed the plaintiffs that the cargo was condemned and the ves-
sel liberated, and that he had supplied the captain, at *Porto Rico,*
with funds to get his vessel away.   In about three or four weeks
after this, the plaintiffs abandoned the cargo to *Gordon,* who had
remained at *St. Domingo* ; but neither the protest nor any other
document relating to the capture and condemnation had then been
received.

After this, *Gordon* being about to leave the island, the plaintiffs directed their agent to take measures to arrest him ; to prevent which the defendants, after several days deliberation, entered into the stipulation on which this action was founded ; and which was of the following tenor.—

" We the undersigned *Paul E. Merrill* and *Nathaniel Gordon*, both of the city of *Portland* shipmasters, do hereby declare that we jointly and each of us separately constitute ourselves security towards Messrs. *Levy, Son & Co.* of this city merchants, for Capt. *Joshua Gordon* of the above cited city of *Portland*, in the manner following, to say—said *Joshua Gordon* having insured the said sum of two thousand dollars on part of the cargo shipped in *March* last on board the American brig *Sam*, bound for *St. Thomas*, as appears by the policy signed on the fifteenth day of *March* 1822 ; and said brig *Sam* having been detained in *Porto Rico*, and her cargo taken out ; the above named *Paul E Merrill* and *Nathaniel Gordon* hold themselves responsible for the amount of the above insurance, according as expressed in the policy, should the said *Joshua Gordon* not pay it on the presentation of regular documents proving the condemnation or loss. And for the security thereof we do hereby engage ourselves personally, and whatever property we may at present be possessed of, or which we shall hereafter possess." This was signed by the defendants, and bore date *Sept.* 22, 1822 ; and upon its execution, the principal, *Joshua Gordon*, was suffered to depart from the island.

A few days before the commencement of this action, which was in *October* 1823, copies of the protest, and of a translation of the decree of condemnation, were left in *Portland* at the house of *Joshua Gordon*, who was absent at sea ; and were also exhibited to the defendant *Merrill*, who was requested to pay the amount, which he declined.

The defendants produced in evidence a letter from the plaintiffs to the president of one of the insurance offices in *Boston*, in which they claimed the amount of certain insurance effected there, declaring that the policy signed by *Gordon* covered only the risks of the sea, and that therefore under it they could not claim the amount of their loss by capture. Hereupon the defen-

dants contended; 1st, that the risk undertaken by the insurer was only a sea-risk ; and that the loss by capture was not within the policy;—2d, that the policy was void, because the goods were not shipped in the names of the true owners ;—3d, that the policy was void, because the brig was sent to sea having on board arti- cles contraband of war, and other goods not mentioned in the manifest or other documents on board ; and was not furnished with the documents required by the treaty with Spain ; and be- cause the vessel had violated the provisions of that treaty";—4th, that the stipulation of the defendants was void, because it was without consideration; and because no consideration was expressed in the agreement itself ;—5th that they were not liable, because no documents or proof of loss had ever been presented to *Joshua Gordon* ;—and 6th, because the abandonment was not made in season.

These points of defence the Chief Justice overruled, for the purpose of ascertaining the amount of the plaintiff's claim; direct- ing the jury to find for the plaintiffs to the value of the mahogany insured, and interest after sixty days from the abandonment ; which they did accordingly. Upon these points, as well as the amount of damages, the case was reserved for the consideration of the court.

*Longfellow* and *Greenleaf* argued for the defendants—1st, that the risk taken was only sea risk, as was evident from the low premium paid, and from the plaintiffs' letter to the under- writers in *Boston*, expressly declaring it to be such. And this evidence *ab extra* is admissible, the reference to " all regular policies" creating a latent ambiguity, which may always be thus explained. To the 2d and 3d points they argued that the sen- tence of condemnation was conclusive as to the facts upon which it was founded ;—*Croudson v. Leonard* 4 *Cranch.* 434 ; and from this it appeared that the brig was sent to sea without the docu- ments required by *Art.* 17, of the treaty of 1795 with Spain ; that she had violated the sixteenth article by carrying goods con- traband of war ; and that by the plaintiffs' own shewing, the evi- dence of ownership of the cargo was false, in stating that it

belonged to *Gordon.* Hence the condemnation was lawful, through the fault of the plaintiffs. *Stocker v. The Merrimack Ins. Co.* 6 *Mass.* 220. *Cleveland v. the Union Ins. Co.* 8 *Mass.* 308. *Garrels v. Kensington* 8 *D. & E.* 230.—4th. The objection that the consideration was not expressed in the agreement itself, they submitted to the court upon the authority of *Saunders v. Wakefield* 4. *Barnw. & Ald.* 595 ; observing that, though it had been held otherwise in *Packard v. Richardson* 17 *Mass.* 122, yet in this State the construction of this part of the statute of frauds was still unsettled. But they insisted that the agreement itself was wholly without consideration, and so void. It was made while the vessel was under detention only, but not condemned. The plaintiffs had no right of action at the time ; and of course could give no indulgence or delay to Capt. *Gordon* ; for he was not liable to be arrested by any principles of general law, and the case shews no law of the place authorizing any precautionary detention. 5th. They further contended that by a fair construction of the contract, it was the duty of the plaintiffs first to make demand of- payment on Capt. *Gordon* ; and that their liability attached only in the event of his refusing to pay in a reasonable time after demand, and upon presentation to him of proper documents proving the loss. But the papers left at his house were only uncertified copies of garbled extracts from the record, shewing little else than the fact of condemnation. To the point that the abandonment was made out of season, it not having been made until three or four weeks after the arrival of certain intelligence of the loss, they cited *Marshall on Ins.* 508. *Livermore v. The Newburyport Ins. Co.* 1 *Mass.* 264. *Smith v. The Newburyport Ins. Co.* 4 *Mass.* 668. *Abel v. Potts* 3 *Esp.* 243. *Aldridge v. Bell* 1 *Stark.* 498.

*N. Emery,* for the plaintiffs, replied to the first point, that the " regular policies" referred to, do usually contain sea risks ; and this policy contains no exception of such perils. If therefore there is in the contract enough to shew that the parties intended to insure, and at an agreed price, it is sufficient. *McCulloch v. The Eagle Ins. Co.* 1 *Pick.* 278. The policy alone is conclusive evidence of the agreement, not to be controled or varied by parol

testimony. *Caines v. Knightly Skin.* 454. *Cheriot v. Barker* 2 *Johns.* 346. *Mumford v. Hallet* 1 *Johns.* 433. *Graves & al. v. The Boston Marine Ins. Co.* 2 *Cranch* 419. *Merry v. Prince* 2 *Mass.* 176. To the 2d and 3d objections he answered that as between these parties, goods contraband of war might lawfully be carried, and insured. *Seton & al. v. Low* 1 *Johns. Ca.* 1. *Skidmore v. Desdoity* 2 *Johns. Ca.* 77. *Juhel v. Rhinelander ib.* 120. *Pond v. Smith & al.* 4 *Con. Rep.* 297. The whole loss was occasioned by the mismanagement and omission of the assurer, who being owner of the vessel and appointing his own master, it was his duty to see that all the documents were furnished which the safety of the voyage might require. *Richardson v. The Maine Fire and Marine Ins. Co.* 6 *Mass.* 102. 7 *Cranch* 536, 234. 12 *Mass.* 291. As to the sentence of condemnation; where various causes are recited as the foundation of the decree, it is to be referred only to those which are good, rejecting all others. *Christie v. Secretan* 8 *D. & E.* 192. To the fourth point he said that after capture it was not necessary for the plaintiffs to litigate with the captors by way of appeal, nor even to contend at all. It was enough that the property was seized and detained, and the voyage broken up. By this event the rights and obligations of the parties were fixed, and the plaintiffs might forthwith proceed at law upon their policy. 2 *Marshall on Ins.* 564, *Condy's ed.* 8 *Johns.* 245. 1 *Caines* 284, 444. And the right to arrest the original debtor being thus perfected, the waiver of it was sufficient consideration for the guaranty in the present case ; and it needs not to be expressed in the agreement, as it is not a contract standing upon the statute of frauds, but upon general principles of national law. 14 *Ves.* 189. *Fell on Guarantees app.* 337. *Packard v. Richardson* 17 *Mass* 122. *Weightman v. Caldwell* 4 *Wheat.* 85. To the objection of the want of a demand on Capt. *Gordon*, he replied that it was not necessary, this being a case of guaranty ; 2 *Johns* 365 ; and if it were generally required, the absence of the party in this case would excuse the omission of all which was not done. *Warrington v. Furber* 8 *East* 245. 1 *Vin. Abr. suppt.* 290.

The opinion of the court was read by the Chief Justice at the following *November* term, as drawn up by

Weston J.    The policy executed by *Gordon* is very brief in its terms ; but with regard to risks, it expressly assumes such as are contained in all regular policies of insurance, to be adjusted according to the rules established at *Lloyd's* in *London*, or at the regular insurance offices in the United States.    It was a policy therefore against what are called the usual risks.    The form of of the policy now used in *London*, and which it seems has varied very little for two hundred years, [*Park* 14] embraces losses arising from " men of war, enemies, pirates, rovers, takings at " sea, arrests, restraints, and detainments of all kings, princes and " people of what nation, condition, or quality soever."    These risks among others are to be found also in the common printed forms in use in this country.    Loss by capture then, being one of the usual risks contained in regular policies, is clearly included in the one in question.    And we are not at liberty to vary a contract, the terms of which are thus explicit, from any considerations drawn from the amount of the premium, or from the letter of the assured to their correspondent, adduced to shew their sense of the contract, written with a view to obtain indemnity from another quarter, in which they were however unsuccessful. In this letter, they speak of the policy of *Gordon* as protecting them against sea risks only ; but in the instrument executed by the defendants, upon which this action is brought, loss by capture is contemplated as being within this policy; and they engaged to hold themselves responsible for the amount, if *Gordon* does not pay on presentation of regular documents, proving the condemnation or loss.    But what risks were in fact assumed must be determined from the policy itself, which we are satisfied includes, among others, the risk of loss by capture.

The property captured was proved at the trial to have belonged to the plaintiffs ; and that it exceeded in value the amount insured by this policy.    But it is contended that the contract cannot be enforced against *Gordon* or against the defendants, who have assumed his responsibility, because the goods on board were not shipped in the name of the true owners.    This fact is distinctly

noticed in the policy and the property thus covered is expressly insured. No law of the United States is violated by a measure of this sort, which was manifestly adopted to protect the property from capture by the enemies of Spain. Nor was it an infringement of the treaty with Spain, adverted to in the decree of condemnation, which requires only certificates of the several particulars of the cargo, and the place whence the ship sailed. As to the owners of the cargo, the language of the treaty is, that "if any one shall "think it fit or advisable to express in the said certificates the "person to whom the goods on board belong, he may freely do "so;" thus leaving to the individuals concerned the full exercise of their discretion upon this point.

It is objected that the brig, in which the goods insured were transported, had on board goods contraband of war. That fact is affirmed in an official representation made to the judge, by *Don Jose Mendose*, captain of the port of *Caboroxo*, into which the prize was carried ; and also in the libel or petition of the captor, praying for condemnation ; but it is not made the basis of the decree of condemnation, nor does the decree take any notice of the charge, other than by an enumeration of a few articles, having this character, among those which are condemned. The seventeenth article of the treaty between the United States and Spain, which is the only article alluded to in the decree, has no reference whatever to the case of contraband goods, which is made the subject of specific stipulations in the sixteenth article. If there is however competent proof that the vessel had goods contraband by the law of nations, or by the treaty with Spain, if she had been bound to an enemy's port ; yet in this case she sailed from a Spanish port, not to a port of the enemy of Spain, but to that of a neutral, to which munitions of war may be innocently carried. It is not pretended that the contraband goods on board, if there were any, were the property of the plaintiffs. The vessel belonged to *Gordon* the insurer, and they must have been received by his privity or that of the master appointed by him, and in his employment. Besides, contraband articles found on board a ship are alone liable to confiscation ; innocent goods are not affected, unless they belong to the same owner. *The Staadt Embden*, 1 *Rob. Adm. Rep.* 26.

Another ground taken in defence is, that the property was con-
demned for a violation of the treaty with Spain, and that upon
this point the decree of condemnation is conclusive.

That the sentence of a foreign court of admiralty, in a case
within its jurisdiction, is conclusive evidence not only of the right
which it establishes, but of the fact which it directly decides, is
a position which has been so uniformly sanctioned by the highest
and most respectable tribunals, that it cannot now be controvert-
ed.   But the sentence adduced does not decide that there had
been any violation of the treaty.   The Judge states that, having
before him the seventeenth article of the treaty of friendship,
limits, and navigation between Spain and the United States of
1795, confirmed also by the new treaty of February 1819, and
having present the thirty second article of the last ordinance
about privateers, and finding the proof of property in the cargo
insufficient, he condemned it.    That article of the treaty is *found*,
upon examination, to require no proof of property except of the
vessel, which, without such proof, is made liable to condemnation.
But the vessel was in this case acquitted.    By the treaty, free
ships made free goods, with the exception only of goods contra-
band of war ;   and no document is therefore required proving
property in the cargo, unless as is provided by the seventeenth
article, as before stated, any one shall think it fit or advisable to
state to whom the goods on board belong, in the certificates con-
taining the several particulars of the cargo, and the place whence
the ship sailed.   The sentence does not in terms profess to con-
demn the cargo for a violation of the treaty ; nor does it decide
any fact, which amounts to such violation.   What may be the
nature of the thirty-second article of their ordinance about priva-
teers, adverted in the sentence, does not appear ;  and if it did, it
could have no influence upon the decision of this cause.   The
port captain it is true, in his official communication, informs the
Judge, and the captain of the privateer in his libel or petition
avers, that certain portions of the cargo were not set forth or
specified, as required by the before mentioned seventeenth arti-
cle ; but these allegations not being directly supported by the
sentence, or even deducible from it upon any fair construction,
cannot be considered as verified by competent proof.

But admitting that the cargo was condemned, because certain parts of it, other than that belonging to the plaintiffs, had not the certificates required by the treaty ; this fault or deficiency does not appear in any degree imputable to the plaintiffs; or that they had any interest in, or any connexion with, the merchandize stated to have been omitted in the manifest. The vessel belonged to *Gordon*, the insurer. The master was appointed by him, and under his control. If he received goods, without the proper certificates required by treaty, and thus occasioned the loss which accrued, it could have no tendency to exonerate *Gordon* from his liability to the plaintiffs, who had done nothing subjecting their merchandize to forfeiture.

It is urged that, if the defendants are liable, this action was prematurely brought ; inasmuch as regular documents, proving the condemnation, had not been presented to *Gordon*. It appears that the sentence of condemnation was finally confirmed on the eighteenth of July, 1822 ; and that an abandonment was offered to *Gordon* in the succeeding month of *August*, which was seasonably made ; as the loss then remained total, and has ever since so continued. *Dorr v. New Eng. Ins. Co.* 11 *Mass.* 1. *Marshall*, 489. *Gordon*, the owner of the brig, must have been apprized by the master appointed by him of what had happened ; and may well be presumed to have been in possession of documents, proving the condemnation, long prior to the action, which was not instituted until more than a year subsequent to the abandonment. It appears further that, before the action was commenced, copies of the protest and of the translation of the sentence of condemnation were left at *Gordon's* house, he being then at sea. Upon these facts, we are of opinion that this objection to the verdict cannot be sustained.

With regard to the consideration for the guaranty entered into by the defendants, the statute of frauds, according to the construction which it has received in Massachusetts and in this State, does not require that the consideration for the collateral undertaking should appear in the note or memorandum, signed by the party to be charged. Upon this point, we are fully satisfied with the reasoning and authority of the case of *Packard v. Richardson*

17 *Mass.* 122. The consideration therefore may be proved by parol. *Keating*, the agent of the plaintiffs, testifies, that it was forbearance on the part of the plaintiffs. This, though a good consideration, as it is conceded, where the party had a right of action, was, it is urged, insufficient in this case ; because the plaintiffs had then no right to require or to enforce payment.

We have no process in this State, by which a party can legally arrest his debtor, for the purpose of security, before his demand has arrived at maturity ; but such process may exist in other countries ; and in regard to strangers and transient persons, may be found essential in the administration of justice. The forbearance of a right to prosecute or arrest for further security would unquestionably form a sufficient consideration for the undertaking of the defendants ; but it must appear that such right existed. This would depend upon the laws of the Spanish colony of *St. Domingo*; and foreign laws are to be proved as facts. *Mostyn v. Fabrigas, Cowper,* 174. *Talbot v. Seaman,* 1 *Cranch,* 38. *Church v. Hubbart,* 2 *Cranch,* 237. *Keating* further testifies that he was directed to arrest *Gordon* ; that he should have done so, but for the interposition of the defendants, who, to induce the forbearance of any prosecution against *Gordon*, after several days deliberation, entered into the guaranty ; whereupon he desisted from taking any measures to arrest him. By the terms prosecution and arrest, we must understand measures authorized by law. The defendants were upon the spot ; they took time to deliberate ; and they had it in their power to acquaint themselves with the course of legal proceedings in that jurisdiction. We do not at this time decide that, upon this evidence, the jury might not have been warranted, under the direction of the court, in inferring that the plaintiffs had a right thus to proceed, by the laws of the then Spanish colony of St. Domingo. But this fact has not been established by their verdict ; nor has it been directly proved ; we are therefore of opinion that the verdict, returned for the plaintiffs, must be set aside. By the case reserved, it is agreed that if upon either of the points taken, the law is with the defendants, the verdict is to be set aside, and the plaintiffs to become nonsuit. The point raised by the defendants, to which we have last advert-

ed, is, that their engagement was without consideration. It appears to us that the facts, necessary to constitute such consideration, have not been sufficiently established ; but as we think it highly probable, from the evidence in the case, that such facts existed, we do not feel warranted in deciding that this engagement was without consideration, without affording an opportunity for a further and more distinct examination of this question.   We do not therefore order the plaintiffs to be called ; but the verdict is set aside, and                               *A new trial granted.*